# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CHAD RHINES,

        Petitioner,                    Case No. 14-cv-12390
                                                  Hon. Matthew F. Leitman

v.

DEWAYNE BURTON,

        Respondent.

_____/

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS COPRUS (ECF #1), (2) DENYING CERTIFICATE OF APPEALABILITY; AND (3) GRANTING PERMISSION TO APPEAL *IN FORMA PAUPERIS*

Petitioner Chad Rhines ("Petitioner") is a state prisoner in the custody of the Michigan Department of Corrections. On June 18, 2014, Petitioner filed a Petition for Writ of Habeas Corpus challenging his state-court conviction of voluntary manslaughter, Mich. Comp. Laws § 750.321 (the "Petition".) (*See* ECF # 1.) The Petitioner raises eight claims for relief, all related to the alleged ineffective assistance of his trial counsel. Petitioner is not entitled to habeas relief. For the reasons stated below, the Petition is therefore **DENIED**. The Court also **DENIES** Petitioner a certificate of appealability and **GRANTS** permission to proceed *in forma pauperis* on appeal.

# I

Petitioner and Jamie Rhines were married in December 2003. They had a daughter, K.R., who was born with cerebral palsy. K.R. is unable to speak and communicates largely through sounds and gestures. On November 2, 2008, Petitioner discovered Jamie and K.R. in bed with another man, LaVern Daniels. Petitioner then grabbed a knife and engaged in a scuffle with Daniels. Petitioner stabbed Daniels several times, and Daniels later died as a result of the wounds Petitioner inflicted. At Petitioner's trial, Jamie and Petitioner told somewhat conflicting stories about the history of their relationship and about the altercation that led to Daniels' death.

## A

Jamie's version of events is as follows. Jamie testified that she and Petitioner separated in 2005 after Petitioner pointed a knife at her and threatened to kill her. (*See* ECF #8-12 at 94, Pg. ID 928.) Shortly after that incident, Jamie moved out of a home that she and Petitioner shared into a home on Michelle Drive in Owosso, Michigan. (*See id.*) Jamie said that she paid the rent for the home on Michelle Drive, and while Petitioner would occasionally stay there, he did not have a key to the home. (*See id.* at 95, Pg. ID 929.)

Jamie testified that in the fall of 2008, Petitioner came to her home uninvited almost every day for two months. (*See id.* at 99-100, Pg. ID 933-34.) Jamie called

the police several times, but Petitioner would leave before authorities arrived. (*See id.* at 103, Pg. ID 937.) On November 1, 2008, Petitioner left thirty-four voice mail messages on Jamie's phone. (*See id.* at 143, Pg. ID 977.) Later that day, she changed her phone number.

On November 2, 2008, the victim, Daniels, visited Jamie at her home. Jamie testified that after K.R., who was about five years old at that time, went to bed, she and Daniels had sex in her bed. (*See id.* at 119, 121, Pg. ID 953, 955.) When they finished having sex, Daniels fell asleep in the bed wearing only his t-shirt (and not wearing any pants.) (*See id.* at 122, Pg. ID 956.) Jamie also fell asleep in the bed. (*See id.*)

Later that evening, K.R. woke up and came into Jamie's bedroom. (*See id.* at 123, Pg. ID 957.) K.R. was upset and laid down in the bed next to her mother. (*See id.* at 123-24, Pg. ID 957-58.) Jamie testified that she was lying in between K.R. and Daniels and that K.R. was never next to Daniels in the bed. (*See id.* at 123, Pg. ID 957.) At that time, Daniels was still wearing a t-shirt, but nothing else. (*See id.* at 123-24, Pg. ID 957-58.) Jamie said that she asked Daniels to put pants on, but he declined. (*See id.* at 124, Pg. ID 958.)

Just as Jamie was falling back asleep, Jamie heard a loud noise and saw Petitioner kick down the door to her bedroom. (*See id.* at 131-32, Pg. ID 965-66.) She testified that when Petitioner saw Daniels in the bed, he left the room, went to

3

the kitchen, and returned. (*See id.*) At that time, Daniels was still asleep. (*See id.* at 134, Pg. ID 968.) When Petitioner returned from the kitchen, Daniels began to wake up. (*See id.*) Petitioner then "pulled the covers off of [Daniels]" and Daniels "leaped over the end of [the] bed." (*Id.* at 134-35, 180-81 Pg. ID 968-69, 1014-15.) Petitioner and Daniels then got into a fistfight. (*See id.* at 133, Pg. ID 967.) At around that same time, Jamie jumped out of bed, reached for her cell phone, and called 911. (*See id.*)

Jamie did not see a knife when the men were scuffling in the bedroom. (*See id.* at 136-37, Pg. ID 970-71.) She testified that Daniels held Petitioner to the side so that she and K.R. could escape to the bedroom across the hall. (*See id.*) When she later emerged from that additional bedroom, neither Petitioner nor Daniels remained in the house. (*See id.*) Jamie found a knife (absent a handle) on the kitchen floor and placed it on the kitchen counter. (*See id.* at 109-10, Pg. ID 943-44.) She also found a knife handle behind her bedroom door. (*See id.* at 116, Pg. ID 950.) As described below, Petitioner admitted that he stabbed Daniels with a knife as they fought one another, and Daniels died from those wounds.[1]

---

[1] At Petitioner's trial, Dr. Allecia Wilson testified as an expert in anatomic and forensic pathology. She performed Daniels' autopsy on November 3, 2008. Dr. Wilson identified the cause of Daniels' death to be multiple stab wounds. (*See id.* at 22, Pg. ID 856.) In total, Daniels suffered fourteen stab wounds. Two of the stab wounds were each sufficient, by themselves, to cause death. (*See id.* at 37, Pg. ID 871.)

**B**

Petitioner testified in his own defense at trial and told a somewhat different version of events from Jamie. According to Petitioner, he lived in the home on Michelle Drive and paid the rent for that home. (*See* ECF #8-15 at 30, Pg. ID 1495.) In September 2007, Petitioner began staying at his mother's home during the week to shorten his commute to work. (*See id.* at 34-35, Pg. ID 1499-1500.) On days when he did not have to work, he stayed at the Michelle Drive home.[2] (*See id.*)

Petitioner acknowledged that his marriage to Jamie was tumultuous. He testified that his wife was known to use drugs and drink to excess when he was not home. (*See id.* at 50-51, Pg. ID 1515-16.) Petitioner said that on the night of the murder, he went to the Michelle Drive home and saw an unfamiliar truck parked outside the home. (*See id.* at 72, Pg. ID 1537.) He approached the door and heard what sounded like someone engaged in sexual intercourse. (*See id.* at 73, Pg. ID 1537.) He also heard sounds from K.R. (*See id.* at 73-74, Pg. ID 1538-39.) Petitioner was accustomed to interpreting K.R.'s mood from sounds that she made and the sounds he heard indicated she was not happy. (*See id.*) Petitioner testified that he became concerned and so he forced his way into the home. (*See id.* at 76, Pg. ID 1541.)

---

[2] Petitioner's mother, Deborah Rhines, also testified for the defense at trial. She testified that, during the relevant time period, Petitioner lived both at her home and the home on Michelle Drive. (*See* ECF #8-15 at 14-15, Pg. ID 1479-80.)

5

Once inside, Petitioner headed to the bedroom. There, he found three people lying in Jamie's bed: Jamie, K.R., and Daniels. (*See id.* at 77-78., Pg. ID 1541-42.) Petitioner testified that Daniels' genitals were about six inches from K.R.'s face. (*See id.* at 78-79, Pg. ID 1542-43.) Petitioner then ran to the kitchen to grab a knife. (*See id.* at 80, Pg. ID 1544.) He testified that he felt he needed a knife because he believed that K.R. was being sexually assaulted. (*See id.* at 81, Pg. ID 1545.) Petitioner wanted to use the knife to "get [Daniels] away from [K.R.]." (*Id.* at 80, Pg. ID 1544.) After Petitioner re-entered the bedroom, Daniels "hopped up" over Jamie and "locked up" with Petitioner. (*See id.*) The two men then began fighting at the end of the bed. During the fight, Daniels punched Petitioner, and Petitioner stabbed Daniels several times. (*See id.* at 80-81, Pg. ID 1544-45.)

The fight then shifted down the hall into the kitchen. (*See id.*) Petitioner grabbed another knife when they entered the kitchen, and he stabbed Daniels again. (*See id.* 83-43, Pg. ID 1547-48.) He testified that Daniels also had a knife and was attempting to stab him (Petitioner). (*See id.*) At one point, Petitioner pushed Daniels up against the refrigerator and believed that that caused a knife to become embedded in Daniels' back. (*See id.* at 84, Pg. ID 1548.) Petitioner denied that he stabbed Daniels when Daniels' back was turned to him. (*See id.* at 86, Pg. ID 1550.) Instead, he claimed that he reached around Daniels' back to stab him when the two were fighting. (*See id.*)

6

After Petitioner stabbed Daniels, Daniels left the home through the backyard of a neighboring house. (*See id.*) Petitioner then also left the home. (*See id.* at 87, Pg. ID 1551.) He drove to the farm where he worked and wrote a suicide note. (*See id.* at 93-96.) He called his mother and, while on the phone with her, his brother arrived at the farm and talked him out of killing himself. (*See* id. at 100-02.) Petitioner then surrendered to police and gave a custodial statement in which he admitted to causing Daniels' death. (*See id.* at 103-05, Pg. ID 1567-69.)

## C

Petitioner was charged with felony murder, Mich. Comp. Laws § 750.316(1)(b), and first-degree home invasion, Mich. Comp. Laws § 750.110a(2). Petitioner was tried before a jury in the Shiawassee County Circuit Court. The jury convicted Petitioner of the lesser offense of voluntary manslaughter and acquitted him of the first-degree home invasion charge. On January 22, 2010, the state court sentenced Petitioner to sixteen years, eight months to forty years imprisonment. The Michigan Court of Appeals affirmed Petitioner's conviction, *People v. Rhines*, 2011 WL 923531 (Mich. Ct. App. March 17, 2011), and the Michigan Supreme Court denied Petitioner leave to appeal. *People v. Rhines*, 489 Mich. 994 (July 25, 2011).

Petitioner now seeks habeas relief on the grounds that his trial attorney was ineffective when he failed to (1) move for DNA testing of blood splatter on the door frame; (2) object when, during jury selection, the trial court told the prospective

jurors that Petitioner and his wife were living apart at the time of the crime; (3) object to the prosecutor's closing argument; (4) object to the trial court's continuing to instruct the jury while a fire alarm sounded; (5) object to the trial court's failure to give a jury instruction on the use of deadly force in self-defense; (6) object to lead-counsel's absence when the court responded to a jury note; (7) object to the trial court's failure to give a "no duty to retreat" instruction; and (8) object to the trial court's handling of jury's question. (*See* Petition, ECF #1 at Pg. ID 6-10.)

Petitioner first raised these claims in the state trial court when he filed a motion for relief from judgment after his direct appeals were rejected. The trial court concluded that Petitioner had procedurally defaulted these claims under Michigan Court Rule 6.508(D)(3) because he did not raise them on direct appeal, and it therefore denied the motion. (*See* 12/18/12 Shiawassee Cir. Ct. Order, #8-19.) The Michigan Court of Appeals denied Petitioner leave to appeal, *People v. Rhines*, No. 316739 (Mich. Ct. App. Apr. 28, 2014), as did the Michigan Supreme Court. *See People v. Rhines*, 495 Mich. 992 (Mich. 2014).

## II

28 U.S.C. § 2254(d)(1), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), limits a federal court's review of constitutional claims raised by a state prisoner in a habeas action where the claims were adjudicated on the merits by the state courts. Under AEDPA, relief is barred unless the state

8

court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of [Section 2254(d)(1)] permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error

well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

### III

When a petitioner's claim is denied in state court "due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review." *Seymour v. Walker*, 224 F.3d 542, 50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977)). A court may excuse such a procedural default "only [if the Petitioner shows] that were was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case." *Id.* (citing *Sykes*, 433 U.S. at 87, 90-91.)

As described above, Petitioner raised his ineffective assistance of counsel claims for the first time in his post-conviction motion for relief from judgment filed in the state trial court. That court held that Petitioner's ineffective assistance claims were procedurally defaulted under Michigan Court Rule 6.508(D)(3) because Petitioner had failed to raise those claims on direct appeal and because he had failed to establish good cause for failing to do so. (*See* 12/18/12 State Ct. Opinion and Order, ECF #8-19.) Thus, this Court cannot grant Petitioner habeas relief unless he

can show cause and prejudice resulting from the default (or that a miscarriage of justice will result). He has failed to do so.

As cause to excuse his procedural default, Petitioner argues that he did not raise these issues on direct appeal because, when his appellate counsel sent him the trial court record in September 2010, he discovered that transcripts from four pretrial proceedings were not included. (*See* Petitioner's Reply Br., ECF #15 at Pg. ID 2240.) He did not receive the transcripts until sometime after conclusion of his direct appeal. (*See id.* at Pg. ID 2241.)

However, while Petitioner may not have had these transcripts until his direct appeal ended, it is evident from the correspondence between Petitioner and his appellate attorney that Petitioner's appellate counsel *did* have these transcripts in the course of representing Petitioner in the Michigan Court of Appeals. (*See* 11/15/11 Letter from Peter Jon Van Hoek to Chad Rhines, ECF #15, Pg. ID 2269.) Because Petitioner's appellate counsel had the transcripts, Petitioner cannot show that his own lack of access to the transcripts establishes cause for failing to raise the ineffective assistance of counsel claims on direct review. And Petitioner is not claiming that his appellate counsel was ineffective for failing to raise on direct appeal trial counsel's alleged ineffectiveness.

Petitioner also does not satisfy the "actual innocence" exception to the procedural default rule. Under that exception, "in an extraordinary case, where a

11

constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant [habeas relief] even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In order to fall within this exception, a habeas petitioner must show that "it is more likely than not that no reasonable juror would have convicted him" in view of "new reliable evidence … that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). Petitioner has failed to satisfy that burden. He has not presented any new reliable evidence that he is actually innocent of the crimes for which he was convicted.

Accordingly, the Court declines to excuse the procedural default. Petitioner is therefore not entitled to habeas relief.

## IV

Even if Petitioner's procedural default could be excused, he would still not be entitled to habeas relief on his ineffective assistance of counsel claims. An ineffective assistance of counsel claim has two components. *See Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *See id.* at 687. To establish deficient representation, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. In order to establish prejudice, a petitioner must show that, but for the

12

constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Id.* at 694. None of Petitioner's claims satisfy the *Strickland* standard.

First, Petitioner argues that his trial counsel was ineffective for failing to move for DNA testing of the blood splatter found on the kitchen door frame. He reasons that *if* testing showed the blood was Petitioner's, his self-defense theory would have been bolstered. The problem with Petitioner's argument is that it is based upon mere speculation. There is nothing in the record to suggest that the DNA profile of the door-frame blood splatter would have matched Petitioner's rather than the victim's. He, therefore, cannot show he was prejudiced by counsel's failure to move for DNA testing of this sample.

Second, Petitioner maintains that counsel was ineffective in failing to object to the trial court's remarks during jury *voir dire* that "Defendant and his wife were living apart at the time of the occurrence here in November, 2008, and the occurrence happened in the home where the wife was resisting…" (ECF #8-10, Pg. ID 61.) Petitioner contends that trial counsel should have objected to this statement because, in effect, it directed a verdict against him on an essential element of the home-invasion charge against him. More specifically, under Michigan law, Petitioner could not be convicted of first-degree home invasion if he resided in the Michelle Drive home and that formed a part of his defense. *See People v. Toole,* 227 Mich.

App. 656, 659 (Mich. Ct. App. 1998.) However, Petitioner cannot show he suffered prejudice from counsel's failure to object to the trial court's remark. Petitioner was *acquitted* of the first-degree home invasion charge. Moreover, the trial court later properly instructed on the first-degree home invasion charge and the proper burden of proof as to each element. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions.").

Third, Petitioner claims counsel was ineffective for failing to object when the prosecutor called him a "liar" during closing argument. (Petition, ECF # 1 at Pg. ID 10.) The prosecution noted that Petitioner's story had many inconsistencies and evolved as he told it, and the prosecutor concluded that Petitioner was not telling the truth. "[P]rosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005.) In this case, the prosecutor highlighted the inconsistencies in Petitioner's testimony and reasonably argued that Petitioner was lying. That was not improper. Petitioner therefore cannot show that counsel was ineffective in failing to object.

Fourth, Petitioner argues that trial counsel should have objected to the judge's decision to continue reading jury instructions while a fire alarm was going off. (*See* Petition, ECF #1 at Pg. ID 10.) The Court sees no indication in the record that the jury was unable to hear the instructions while the alarm sounded. Moreover, the trial

court paused to ensure that the jurors were still doing "okay" despite the alarm. (ECF #8-16 at Pg. ID 1747.) Furthermore, each juror was provided with a copy of the written instructions to follow along while the judge read the instructions, and each juror was permitted to take the instructions into the jury room. (*See id.* at 1735.) Because the jurors were provided with written instructions and no juror indicated an inability to hear when the judge paused the proceedings to check if everything was "okay," the Court concludes that Petitioner has not shown any prejudice resulting from trial counsel's failure to object.

Fifth, Petitioner argues that defense counsel was ineffective for failing to object to the trial court's failure to give an instruction on the use of deadly force in self-defense. (*See* Petition, ECF # 1 at Pg. ID 9.) Defense counsel and the prosecution each requested this instruction (*see* ECF # 8-18 at Pg. ID 1911, 1913), but it was not given. No discussions regarding the trial court's decision not to give this instruction were placed on the record. Defense counsel did not object to the trial court's failure to give this instruction. The Court agrees with Petitioner that the trial record contained enough evidence to support a self-defense instruction but disagrees that counsel was ineffective for failing to object to the trial court's failure to give such an instruction.

Under Michigan law, one acts lawfully in self-defense if he or she honestly and reasonably believes that he is in danger of serious bodily harm or death, as

15

judged by the circumstances as they appeared to the defendant at the time of the act. *See Blanton v. Elo*, 186 F.3d 712, 713, n. 1 (6th Cir. 1999) (citing *People v. Heflin*, 434 Mich. 482, 456 N.W. 2d 10 (1990)). Petitioner's and Jamie's testimony at trial provided some support for a self-defense instruction. For instance, Jamie testified that when Petitioner burst into her bedroom for the second time, and after he ripped the covers off Daniels, Daniels jumped off the bed and started fighting with Petitioner. And Petitioner testified that Daniels punched him repeatedly and tried to stab him.

However, the thrust of Petitioner's own testimony was that he acted *to protect his daughter, not himself*. Petitioner testified that he retrieved a knife to use against Daniels as soon as he saw Daniels lying next to his daughter and *before* Daniels jumped off the bed and came toward him. There is some obvious tension between this testimony – i.e., that Petitioner grabbed a deadly weapon *before* he *personally* faced any danger – and a self-defense defense. And given this tension, it was not unreasonable for defense counsel to adopt the defense-of-others defense instead of (1) a self-defense defense or (2) a combination of both defenses. Moreover, the fact that the jury rejected Petitioner's defense-of-others defense provides some indication that they did not believe Petitioner and makes it unlikely that the jury would have accepted a self-defense defense that rested in large part upon Petitioner's testimony. In sum, while the record could have supported a self-defense instruction, Petitioner

has not shown that counsel was unreasonable for failing to object to the trial court's failure to give that instruction, nor has Petitioner shown a reasonable probability that the result of the proceeding would have been different if that iinstruction had been given.

Sixth, Petitioner argues that counsel was ineffective for failing to object when the court responded to a note from the jury when lead defense counsel was not present but co-counsel was. The jury submitted notes to the court on two separate occasions. The record shows that both attorneys representing Petitioner were present when the court discussed the first note outside the jury's presence and when the court responded to the first note. (*See* ECF #8-16 at Pg. ID 1761-62.) With regard to the second note, it is not clear whether both attorneys were present. Only one of Petitioner's attorneys responded on the record, but this does not establish that only one attorney was present. (*See id.* at Pg. ID 1764.) Petitioner has not identified any Supreme Court precedent requiring that the entire defense team be present at all proceedings before the court, and this Court is unaware of any precedent requiring as much. In addition, even if lead counsel was absent, Petitioner fails to allege any way in which he was prejudiced by lead counsel's absence.

Seventh, Petitioner claims that defense counsel was ineffective in failing to object when the trial court declined to instruct the jury that Petitioner had no duty to retreat. The instructions as given did not impose upon Petitioner a duty to retreat.

17

The instructions adequately informed the jury about Petitioner's defense and that Petitioner could take reasonable steps to protect his daughter if he reasonably believed that she was subject to serious physical injury. Petitioner has not shown a reasonable probability that the result of the proceeding would have been different had his attorney objected to the absence of the duty to retreat instruction.

Petitioner final claim concerns the trial court's response to a jury note asking for clarification on the difference between "manslaughter and defense of others (deadly force) if any." (ECF #8-16 at Pg. ID 1765.) The trial court responded to that question by informing the jury that those concepts were defined in the written instructions and referring the jury to those instructions. (*See id.*) The trial court also invited the jurors to "powwow" in the jury box to construct a clearer question for the court to consider. (*Id.*) The jury did so and presented the court with another question. (*See id.* at 1765-66.) The basis for Petitioner's challenge is somewhat unclear. As best the Court can discern, he challenges the invitation to the jury to confer in the jury box as a violation of the principle that jury deliberations shall remain private and secret. *See United States v. Olano*, 507 U.S. 725, 737-38 (1993). However, Petitioner fails to show that anyone in the courtroom could overhear the jurors' discussion while they were "huddle[d]" together. (ECF #8-16 at Pg. ID 1765.) Nor has he identified any prejudice resulting from the jury's brief discussion in the jury box. Defense counsel was therefore not ineffective in failing to object.

18

# V

The Court concludes that Petitioner's claims lack merit and that he is not entitled to federal habeas relief. Accordingly, the Court **DENIES** and **DISMISSES** the Petition **WITH PREJUDICE**.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b.) A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2.) When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000.) "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The Court concludes that Petitioner has failed to demonstrate that jurists could conclude the issues presented here are adequate to deserve encouragement to proceed further. Accordingly, the Court **DENIES** a certificate of appealability.

Although this Court has denied Petitioner a certificate of appealability, the standard for granting an application for leave to proceed *in forma pauperis* ("IFP") is lower than the standard for certificates of appealability. *See Foster v. Ludwick*,

208 F.Supp.2d 750, 764 (E.D. Mich. 2002) (citing *United States v. Youngblood*, 116 F.3d 1113, 1115 (5th Cir. 1997)). While a certificate of appealability may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant IFP status if it finds that an appeal is being taken in good faith. *See Foster* at 764-65; *see also* 28 U.S.C. § 1915(a)(3); Fed. Rule App. Proc. 24(a). Although jurists of reason could not debate this Court's resolution of Petitioner's claims, the issues Petitioner raises are not frivolous. Therefore, Petitioner could appeal this Court's decision in good faith. The Court therefore **GRANTS** Petitioner leave to proceed *in forma pauperis* on appeal.

**IT IS SO ORDERED**.

Dated: August 7, 2017

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 7, 2017, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764